UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 4:19-cv-10172-KMM

DUANE DOZER,

    Plaintiff,
v.

COKA VENTURES, LLC, *et al.*,

    Defendants.
_____/

# ORDER

THIS CAUSE came before the Court upon Plaintiff Duane Dozer's ("Plaintiff") Motion for Partial Summary Judgment ("Pl.'s Mot.") (ECF No. 41) and Defendant CoKa Ventures, LLC ("Defendant CoKa") and Defendant S/F *Bad Habit's* (collectively, "Defendants") Motion for Summary Judgment ("Defs.'s Mot.") (ECF No. 48). The Parties responded to the others' Motion. ("Defs.'s Resp.") (ECF No. 53); ("Pl.'s Resp.") (ECF No. 65). The Parties filed replies. ("Pl.'s Reply") (ECF No. 61); ("Defs.'s Reply") (ECF No. 69). The Motions are now ripe for review.

**I.   BACKGROUND**[1]

Defendant CoKa owns a forty-five (45) foot sport fishing vessel named *Bad Habit* ("*Bad Habit*" or "Vessel"). Pl.'s 56.1 ¶ 1; Defs.'s Resp. 56.1 ¶ 1. The ownership and management of the Defendant company is shared jointly between Karen Sobotka ("Sobotka") and Colin Hutzler ("Hutzler"). Pl.'s 56.1 ¶ 2; Defs.'s Resp. 56.1 ¶ 2  On August 26, 2017, Plaintiff and Defendant

---

[1] The undisputed facts are taken from Plaintiff's Statement of Material Facts in Support of His Motion for Partial Summary Judgment ("Pl.'s 56.1") (ECF No. 42), Defendants' Response to Plaintiff's Statement of Material Facts ("Defs.'s Resp. 56.1") (ECF No. 54), Defendants' Statement of Facts in Support of Defendants' Motion for Summary Judgment ("Defs.'s 56.1") (ECF No. 46), Plaintiff's Opposing Statement of Material Facts to Defendants' Motion for Summary Judgment ("Pl.'s Resp. 56.1") (ECF No. 64), and a review of the corresponding record citations and exhibits.

CoKa entered into an employment agreement whereby Defendant CoKa employed Plaintiff as its charter boat fisherman and captain for an initial term of five (5) years with an annual salary of $70,000 per year. Pl.'s 56.1 ¶ 3; Defs.'s Resp. 56.1 ¶ 3. Plaintiff's duties included maintaining the vessel, booking charters, and taking clients out on fishing charters. Pl.'s 56.1 ¶ 4; Defs.'s Resp. 56.1 ¶ 4.

Plaintiff contends that he "seriously injured his back while crawling around *Bad Habit's* engine room looking for an oil leak" on July 12, 2019. Pl.'s 56.1 ¶ 7; Defs.'s Resp. 56.1 ¶ 7. Defendant CoKa disputes this contention, citing to its Answer and Affirmative Defenses, (ECF No. 30) ¶¶ 2–4, wherein Defendant denies and "demands strict proof of all factual allegations" contained in the relevant paragraphs. *See* Defs.'s Resp. 56.1 ¶ 7. However, it is undisputed that Plaintiff "reported his work-related back injury to Defendant CoKa's manager" on July 15, 2019. *See* Pl.'s 56.1 ¶ 8, Ex. 2; Defs.'s Resp. 56.1 ¶ 8. Plaintiff contacted Defendant CoKa again on July 18 and July 19, 2019 regarding the injury. Pl.'s 56.1 ¶¶ 9–10, Exs. 3–4; Defs.'s Resp. 56.1 ¶¶ 9–10. In the July 19, 2019 communication, Plaintiff advised Defendants that he needed a workers' compensation claim number in preparation for a medical appointment on July 22, 2019. Pl.'s 56.1 ¶ 10, Ex. 4; Defs.'s Resp. 56.1 ¶ 10. On July 22, 2019, Plaintiff and Defendant CoKa's manager, Sobotka, exchanged text messages wherein Plaintiff advised Sobotka that he had not had "feeling" in his shin or his foot for "over a week" since his back injury and that he needed "a worker's comp claim to get an MRI to review the extent of the nerve damage." Pl.'s 56.1 ¶ 11, Ex. 5; Defs.'s Resp. 56.1 ¶ 11. In response, Sobotka advised Plaintiff that Defendants did not have and were not required to carry worker's compensation under Florida law, and Plaintiff would "have to be responsible for [his] own medical care." *Id.*

On July 24, 2019, Plaintiff was seen by a registered nurse who issued a letter advising that Plaintiff was "unable to return to work until further notice," Plaintiff would be having an MRI "to

2

evaluate his back," and Plaintiff "has a right foot drop that makes it very dangerous to do any job on a boat and will not be able to return until this is corrected." *See* Pl.'s 56.1 Ex. 6. On July 25, 2019, Defendant CoKa terminated Plaintiff's employment and offered Plaintiff severance pay of $6,279.58 in exchange for executing a Confidential Separation Agreement and General Release ("Separation Agreement").[2] *See* Pl.'s 56.1 ¶ 14, Ex. 7; Defs.'s Resp. 56.1 ¶ 14. Plaintiff refused to sign the Separation Agreement. Pl.'s 56.1 ¶ 15; Defs.'s Resp. 56.1 ¶ 15.

On July 31, 2019, Plaintiff was seen by Dr. Fabio Roberti, a neurosurgeon at the Cleveland Clinic Indian River Hospital. Pl.'s 56.1 ¶ 16; Defs.'s Resp. 56.1 ¶ 16. Dr. Roberti's treatment notes, in relevant part, noted that "in light of the severe foot weakness [he] recommended a surgical procedure of right L4-5 laminectomy foraminotomy diskectomy" which was "recommended to be [performed] as soon as possible." Pl.'s 56.1 Ex. 8. Further, Dr. Roberti noted that they "also discussed alternative techniques and management and the fact that even a successful surgery may not completely resolve the deficit although the prognosis is better if a prompt decompression is performed." *Id.* Finally, Dr. Roberti noted that Plaintiff "understood and agree[d] and would like to think about the option and will contact [Dr. Roberti's] office if he would like to proceed with

---

[2] The Separation Agreement included a general release of:

> [A]ll claims, liens, contracts, obligations, duties, demands, actions, causes of action, suits, debts, sums of money and damages, direct or indirect, known or unknown, matured or unmatured, of every kind (including without limitation [sic] attorneys' fees and costs) whether raised in common law, contract, statute or regulation or otherwise, which has ever had or now may have against CoKa, from the beginning of time through the Effective Date of this Agreement, including without limitation, all claims raised or that could have been raised in a lawsuit or other legal proceeding, or otherwise.

Pl.'s 56.1 Ex. 7.

surgery." *Id.* Also on July 31, 2019, Plaintiff sought legal assistance from attorney James Stroup.[3] *See* Pl.'s 56.1 ¶ 18; Defs.'s Resp. 56.1 ¶ 18.

On August 2, 2019, Defendant CoKa's underwriter appointed an attorney to handle the matter. Pl.'s 56.1 ¶ 21; Defs.'s Resp. 56.1 ¶ 21. On August 9, 2019, Defendant CoKa's counsel, also representing *Bad Habit's* insurer, issued a letter to Dr. Roberti stating that the insurer "agreed to provide coverage for the reasonable medical expenses for the right L5-5 laminectomy foraminotomy discectomy [sic]" and requesting that the "medical records and medical bills associated with the procedure" be sent to Defendant CoKa's counsel once the procedure was completed. *See* Defs.'s Resp. 56.1 ¶ 35, Ex. A. On August 19, 2019, Defendant CoKa's counsel was advised that payment to the hospital was due prior to the date of service. *See* Defs.'s Resp. 56.1 ¶ 58, Ex. C. Also on August 19, 2019, Defendant CoKa's counsel executed and sent to the hospital an Agreement Statement wherein the insurer "agree[d] to pay the amount charged" and advised the hospital that it would be "making prepayment for the amount of $30,340.20." *See* Defs.'s Resp. 56.1 ¶ 58, Ex. B. On September 10, 2019, Defendant CoKa's attorney sent a letter and a check in the amount of $30,340.20 to the Cleveland Clinic, indicating that payment "is for the hospital charge associated with [Plaintiff'] surgery." Pl.'s 56.1 ¶ 33, Ex. 10; Defs.'s Resp. 56.1 ¶ 33.

On September 18, 2019, Dr. Roberti performed a "[r]ight minimally invasive L4-L5 hemilaminectomy with partial facetectomy, foraminotomy, and disketomony." Pl.'s 56.1 ¶ 34, Ex. 11; Defs.'s Resp. 56.1 ¶ 34. On September 25, 2019, Plaintiff had a follow-up examination with

---

[3] This fact, along with several emails Plaintiff's attorney sent to Defendant CoKa's manager and counsel in the days that followed, is disputed to the extent that it is supported only by a report prepared by Plaintiff's attorney. *See* Defs.'s 56.1 ¶¶ 18–27, 30–32. The statements made in these alleged emails and the requests for status updates, however, are not material to the instant motions for summary judgment.

Dr. Roberti who observed that Plaintiff "still had severe weakness of the foot with no significant changes, but the pain was much improved." Pl.'s 56.1 ¶ 36; Defs.'s Resp. 56.1 ¶ 36; ("Dr. Roberti Dep. Tr.") (ECF No. 39-1) at 30:9–19.  On October 16, 2019, Plaintiff had another follow-up examination with Dr. Roberti who observed that Plaintiff "still [had] the foot drop with significant weakness, but no significant pain." Pl.'s 56.1 ¶ 37; Defs.'s Resp. 56.1 ¶ 37; Dr. Roberti Dep. Tr. at 33:12–16.  On September 2, 2020, Plaintiff was examined by Dr. Juan Uribe who noted that Plaintiff "has chronic neuropathy involving the right L4 and L5 nerve roots likely associated to delay in treatment for a herniated lumbar disc." (ECF No. 37-1).  During his deposition, Dr. Uribe explained that "it is possible that the current issue that [Plaintiff] has with pain and foot drop could be related to not . . . optimal care." ("Dr. Uribe Dep. Tr.") (ECF No. 45-1) at 24:3–13.  When asked whether he could "definitively determine that the chronic neuropathy involving the right L4-L5 nerve roots are definitively related to the delay in treatment," Dr. Uribe responded that he could not "entirely relate it." *Id.* at 32:10–25.

On December 9, 2019, Plaintiff filed the operative Amended Complaint.  ("Am Compl.") (ECF No. 23).  Therein, Plaintiff brings a maintenance and cure claim in connection with the July 2019 back injury as well as a gallbladder illness and surgery that occurred in August 2018 ("Maintenance and Cure Claim") (Count I), *see id.* ¶¶ 65–73; a Jones Act negligence claim for failure to provide prompt, proper, and adequate medical care for Plaintiff's back injury ("Jones Act Negligence Claim") (Count II), *see id.* ¶¶ 74–78; and a retaliatory discharge claim ("Retaliatory Discharge Claim") (Count III), *see id.* ¶¶ 79–82.

Now, Plaintiff moves for partial summary judgment as to liability for his Maintenance and Cure Claim and Jones Act Negligence Claim.  *See generally* Pl.'s Mot.  Defendants move for

5

summary judgment as to the Maintenance and Cure Claim and the Retaliatory Discharge Claim.[4] *See generally* Defs.'s Mot.

## II. LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (citation omitted). Speculation cannot create a genuine issue of material fact sufficient to defeat a well-supported motion for summary judgment. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In assessing whether the moving party has met this burden, a court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001). Once the moving party satisfies its initial

---

[4] While Defendants broadly assert that they "move for summary judgment on the causes of action brought in Plaintiff's Verified Amended Complaint," which implies that they move for summary judgement on all counts, Defendants did not move for summary judgment as to the Jones Act Negligence Claim in their initial Motion. Defendants raise arguments as to the Jones Act Negligence Claim for the first time in their Reply brief, in which Defendants argue that "it is abundantly clear that Defendants seek summary judgment as a matter of law [on the Jones Act Negligence Claim] via its separate *Daubert* Motion," which is procedurally improper and thus the Court will not consider such arguments for summary judgment purposes. *See* Reply at 9–10; S.D. Fla. L.R. 7.1(c)(1) (A "reply memorandum shall be strictly limited to rebuttal of matters raised in the memorandum in opposition without reargument of matters covered in the movant's initial memorandum of law."), and 7.1(c)(2) ("Filing and service of multiple motions for partial summary judgment is prohibited, absent prior permission of the Court.").

burden, the burden shifts to the non-moving party to present evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); Fed. R. Civ. P. 56(e). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citation omitted). But if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Cross motions for summary judgment do not change the standard. *Westport Ins. Corp. v. VN Hotel Grp., LLC*, 761 F. Supp. 2d 1337, 1341 (M.D. Fla. 2010) (citing *Latin Am. Music Co. v. Archdiocese of San Juan of Roman Catholic & Apostolic Church,* 499 F.3d 32, 38 (1st Cir. 2007)). Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.,* 395 F.3d 533, 538–39 (5th Cir. 2004).

**III.   DISCUSSION**

    **A.   Plaintiff's Motion for Partial Summary Judgment**

Plaintiff argues that he was a seaman for purposes of the Jones Act, and as such, Defendant had "a non-delegable duty to provide prompt and adequate medical care" to Plaintiff. Pl.'s Mot. at 10–11. Plaintiff argues that he is entitled to partial summary judgment for his "Jones Act negligence claim for failure to promptly treat his back injury as well as maintenance and cure." *Id.* at 15.

The Jones Act provides that "[a] seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C.

§ 30104. "A Jones Act claim has four elements: (1) plaintiff is a seaman; (2) plaintiff suffered an injury in the course of employment; (3) plaintiff's employer was negligent; and (4) employer's negligence caused the employee's injury, at least in part." *Jackson v. NCL Am., LLC*, No. 14-23460-CIV-WILLIAMS, 2016 WL 9488717, at *2 (S.D. Fla. Jan. 26, 2016) (quoting *Bendlis v. NCL (Bahamas), Ltd.*, No. 15-24731-CIV, 2015 WL 1124690, at *2 (S.D. Fla. Mar. 11, 2015)) (internal quotation marks omitted). "In establishing a Jones Act claim based on negligence, the elements of duty, breach, and injury[] draw on common law principles; the element of causation is relaxed; and some common law defenses are modified or abolished." *Thompson v. Oceania Cruises, Inc.*, No. 15-20484-CIV-Moreno, 2015 WL 12562892, at *1 (S.D. Fla. Oct. 13, 2015) (quoting *Hernandez v. Trawler Miss Verde Mae, Inc.*, 187 F.3d 432, 437 (4th Cir. 1997)) (internal quotation marks omitted) (alternations adopted). "Even with the relaxed causation standard, the Jones Act 'does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur.'" *Id.* (quoting *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994)). Both employer and employee are "obligated to act with ordinary prudence." *Id.* (citing *Pettis v. Bosarge Diving, Inc.*, 751 F. Supp. 2d 1222, 1241–42 (S.D. Ala. 2010)).

The Jones Act is not an exclusive remedy. *See Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 415–16 (2009) ("The Jones Act [] created a statutory cause of action for negligence, but it did not eliminate pre-existing remedies available to seamen for the separate common-law cause of action based on a seaman's right to maintenance and cure. Section 30104 bestows upon the injured seaman the right to 'elect' to bring a Jones Act claim, thereby indicating a choice of actions for seamen—not an exclusive remedy.").

"'Maintenance and cure' is an ancient common-law maritime remedy for seamen who are injured while in the service of a vessel." *Hurtado v. Balerno Int'l Ltd.*, 408 F. Supp. 3d 1315, 1326

(S.D. Fla. 2019) (citing *Flores v. Carnival Cruise Lines*, 47 F.3d 1120, 1127 (11th Cir. 1995)). "The shipowner's obligation is deep-rooted in maritime law and is an incident or implied term of a contract for maritime employment." *Id.* (quoting *McCorpen v. Cent. Gulf S. S. Corp.*, 396 F.2d 547, 548 (5th Cir. 1968)) (internal quotation marks omitted). "Admiralty courts have been liberal in interpreting this duty for the benefit and protection of seamen who are its wards." *Id.* (quoting *Vaughan v. Atkinson*, 369 U.S. 527, 531–32 (1962)) (internal quotation marks omitted). "A shipowner's liability for maintenance and cure is among the most pervasive of all, and is not to be defeated by restrictive distinctions nor narrowly confined." *Id.* (quoting *Vaughan*, 369 U.S. at 531–32) (internal quotation marks omitted). "Ambiguities or doubts in the application of the law of maintenance and cure are resolved in favor of the seaman." *Id.* (citing *Gaspard v. Taylor Diving & Salvage Co., Inc.*, 649 F.2d 372, 374 (5th Cir. 1981)). "The cause of action for maintenance and cure includes three specific items of recovery: (1) maintenance, which is a living allowance; (2) cure, which covers nursing and medical expenses; and (3) wages." *Flores*, 47 F.3d at 1122 (citation and internal quotation marks omitted) (alternation adopted).

As an initial matter, the Parties dispute, to some degree, whether Plaintiff was a "seaman" under the Jones Act. *See* Pl.'s 56.1 ¶ 6; Defs.'s Resp. 56.1 ¶ 6. However, Defendants only dispute this fact to the extent that they view Plaintiff's status as a seaman to be a legal conclusion. *See id.* To qualify as a seaman, "an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission" and more importantly, "a seaman must have a connection to a vessel in navigation . . . that is substantial in terms of both its duration and its nature." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995) (quoting *McDermott Intern., Inc. v. Wilander*, 498 U.S. 337, 355 (1991)) (internal quotation marks omitted) (alternations adopted). Here, it is undisputed that Plaintiff was hired to serve as *Bad Habit's* captain for a five-year period, Plaintiff was contractually required to devote his full time to Defendant CoKa's fishing charter business, and

Plaintiff was always "on call." *See* Pl.'s 56.1 ¶¶ 1, 3–4; Defs.'s Resp. 56.1 ¶¶ 1, 3–4. The Court finds that, as a factual matter, Plaintiff has met his burden of establishing that he was a Jones Act seaman. *See McNeill v. J.E. Brenneman Co.*, Civ. A. No. 78-2637, 1983 WL 2176, at *1 (E.D. Pa. June 17, 1983) (finding that the determination of whether a plaintiff is a Jones Act seaman is a factual matter). Thus, the fundamental question before the Court is whether Defendants were negligent in their purported delay in securing Plaintiff's surgery, and whether that delay caused Plaintiff further injury.

Plaintiff argues that Defendant CoKa had "non-delegable duties to promptly investigate [Plaintiff's] need for back surgery and timely provide him the necessary surgery to decompress the L4–L5 nerves." Pl.'s Mot. at 11. Plaintiff argues that "[b]reach of these duties renders [Defendant] CoKa liable for [Plaintiff's] damages." *Id.* at 12. Specifically, Plaintiff argues that Defendant CoKa and its insurer did not act promptly in investigating Plaintiff's claim and in securing Plaintiff's needed surgery. *Id.*

According to Plaintiff, Defendant CoKa's "rejection of [Plaintiff's] request for medical care and its insurer's delay in paying the hospital caused over a nine week delay in [Plaintiff] getting surgery," even though Plaintiff's treating physicians "opined time was of the essence to remove the herniated disc to relieve the pressure exerted on the L4–L5 nerves." *Id.* "Dr. Uribe opines that [Plaintiff] has chronic neuropathy involving the right L4 and L5 nerve roots likely caused by the delay in treatment for the herniated disc." *Id.* "Dr. Lichtblau opines with certainty that [Plaintiff] would have obtained an optimal recovery if he had surgery in close proximity to the MRI results taken soon after the accident." *Id.* at 12–13. "Both Drs. Uribe and Lichtblau opine that [Plaintiff] has a right foot drop and chronic pain because of the delay in providing [Plaintiff] with prompt surgery." *Id.* at 13. Defendant CoKa "did not make any effort to prepay the hospital to allow [Plaintiff] to obtain prompt back surgery as recommended by Dr. Roberti, the treating

10

neurosurgeon." *Id.* at 14.  Defendant CoKa's "non-delegable duty to provide [Plaintiff] with prompt surgery [did] not allow it to merely turn the matter over to its Lloyd's insurance syndicate, Aspen, and ignore the injured seaman." *Id.*  Plaintiff argues that Defendant CoKa's behavior, and that of its agents, regarding Plaintiff's "demand for immediate back surgery, as prescribed by Dr. Roberti, demonstrates [Defendant] CoKa breached its non-delegable duties to investigate [Plaintiff's] injury and provide him prompt medical treatment." *Id.*  Plaintiff argues that his treating physicians' and experts' opinions demonstrate that Defendant CoKa's "failure to provide prompt back surgery caused a permanent right foot drop and chronic pain for which [Plaintiff] should be justly compensated." *Id.*

With the burden shifting, Defendants argue that (1) "the record evidence clearly shows that Plaintiff's lumbar herniation and related right foot drop occurred within two (2) days of the July 12th incident and before [Plaintiff] requested medical care from Defendant CoKa"; (2) Plaintiff's treating physicians "testified in deposition that successful back surgery would not guarantee a betterment of Plaintiff's foot drop and back pain"; and (3) Plaintiff cannot carry his burden to show "what type of delay could cause [his] alleged injuries and how the alleged delay to undergo decompression surgery caused the alleged resulting injuries." Defs.'s Resp. at 3–5.  Specifically, Defendants argue that Plaintiff testified that the onset of "numbness" occurred the day before he reported his injury to Defendant CoKa's manager, and thus Plaintiff "cannot claim that Defendant CoKa Ventures somehow caused or exacerbated his alleged injuries." *Id.* at 3–4; ("Dozer Dep. Tr.") (ECF No. 46-1) at 36:5–19.  Defendants argue that "because Plaintiff's pre-existing foot drop and back injury were not guaranteed to be resolved by the decompression surgery and there is no medical science to support any such opinions, Plaintiff cannot prove that Defendant [CoKa's] alleged failure to provide him with prompt medical care has led to his current alleged injuries which are incidental to the alleged injuries he complained of when he first requested that

11

Defendants provide him with medical care." Defs.'s Resp. at 4–5. Finally, Defendants argue that even after receiving Dr. Roberti's recommendation for surgery on July 31, 2019, "the record evidence shows that Plaintiff did not advise Dr. Roberti that he wanted to go forward with the surgical procedure until August 7, 2019." *Id.* at 5; Dr. Roberti Dep. Tr. at 51:15–53:4. Then, on August 9, 2019, Defendant CoKa "agreed to pay for the recommended [surgery] as requested by Plaintiff." Defs.'s Resp. at 6.

Here, while there may have been some delay attributable to Defendant CoKa's in terms of investigating Plaintiff's claim of injury and in sending payment to the hospital to provide Plaintiff with medical care, it is not clear from the record evidence that (1) *all* of the delays involved were directly attributed to Defendant CoKa; (2) but for Defendant CoKa's delay, Plaintiff would have been immediately scheduled for surgery; and (3) if Plaintiff had an earlier surgery, the outcome would, most likely, have been improved. Of particular importance is that on August 9, 2019, Defendant CoKa's counsel notified Dr. Roberti in writing that its insurer agreed to provide coverage for the medical expenses associated with Plaintiff's surgery. *See* Defs.'s 56.1 ¶ 35, Ex. A. The fact that the hospital did not accept Defendant CoKa's letter guaranteeing payment as sufficient to move forward with immediately scheduling Plaintiff's surgery does not impute liability, as a matter of law, upon Defendant CoKa.[5] The threshold question before the Court is whether Defendant CoKa breached its duty to act with ordinary prudence in providing Plaintiff with cure for his injury, and if so, whether that breach caused further injury to Plaintiff. And,

---

[5] Plaintiff argues in Reply that the August 9, 2019 letter was flawed in that it did not promise payment "in accordance with an established rate schedule" and that it premised its payment guarantee on reasonable charges. Reply at 4. Then, Plaintiff argues that "another month passed" before Defendant CoKa "made the required pre-payment arrangements demanded by Cleveland Clinic." However, the record evidence does not show that Defendant CoKa was aware that pre-payment was required until August 19, 2019. *See* Defs.'s Resp. 56.1 Ex. C. All delays associated with scheduling Plaintiff's surgery cannot be attributed entirely to Defendant CoKa based on the record evidence presented.

because "reasonable minds could differ on the inferences arising from [the] undisputed facts" here, the Court cannot grant Plaintiff's Motion for Summary Judgment. *See Miranda*, 975 F.2d at 1534.

### B.  Defendants' Motion for Summary Judgment

As to Plaintiff's Maintenance and Cure Claim, Defendants argue that (1) they are not obligated to provide maintenance and cure benefits for Plaintiff's gallbladder illness and surgery that occurred in August 2018, and (2) they have paid maintenance and cure benefits related to Plaintiff's July 2019 back injury. Defs.'s Mot. at 3–8. Further, Defendants argue that Plaintiff's Retaliatory Discharge Claim is meritless "because Plaintiff cannot affirmatively show that the Defendants discharged him based on personal injuries." *Id.* at 8–9.

1. <u>Maintenance and Cure</u>

Defendants argue that Plaintiff "was not in service of the Vessel at the time of sustaining the alleged gallbladder illness and subsequent removal." *Id.* at 4. Specifically, Defendants argue that (1) "Plaintiff was not on board the Vessel for nearly four weeks prior to the gallbladder issues/removal nor was he anywhere near the Vessel for nearly two months during the time that he dealt with his gallbladder issues"; (2) "the Vessel was not scheduled to be used for any charters during the time that Plaintiff was away from the Vessel"; (3) Plaintiff never requested that Defendant CoKa provide him with medical care and treatment for his gallbladder injury and surgery; and (4) Plaintiff's claim for "maintenance" does not stand because Defendant CoKa paid Plaintiff his "entire salary at all times related to his treatment for gallbladder illness." *Id.* at 4–5.

Plaintiff argues that a liberal interpretation applies to determine whether he was "in the service of the ship" at the time that his gallbladder illness arose. Pl.'s Resp. at 5. Plaintiff argues that he was always "on call" even when not physically present on the Vessel and he was thus "within the service of the ship even while at home." *Id.* at 4–5. Plaintiff argues that disputed issues of fact exist concerning (1) when Plaintiff's symptoms began affecting him and whether he

was aboard the Vessel at that time; (2) when Defendant CoKa became aware of Plaintiff's illness; (3) what Defendant CoKa did to investigate Plaintiff's need for medical treatment; and (4) whether Defendant CoKa made any payments for medical treatment. *Id.* at 7–8.

Here, the record evidence is not conclusive enough to find, as a matter of law, that Plaintiff was not "in the service of the ship" at the time his gallbladder illness began. Defendants assert that "[i]n August of 2018, while at home in Vero Beach, Florida and away from the Vessel which was moored in Islamorada, Plaintiff had gastrointestinal pain that ultimately led [sic] his personal physician determining that his gallbladder should be removed." Defs.'s 56.1 ¶ 2. Conversely, Plaintiff asserts that he "experienced gastronomical illness for three to four months leading up to his gallbladder surgery on August 31, 2018" and he "experienced gallbladder illness both on and off the Vessel and he was always within the service of the Vessel because he was subject to its call." Pl.'s Resp. 56.1 ¶ 2. Thus, Defendants' argument that Plaintiff was not "in the service of the ship" when his gallbladder illness surfaced is disputed. Plaintiff may very well have been "in the service of the ship" when his symptoms began and then away from the ship for some time as a result of his illness and recovery therefor. The record is too speculative, and Defendants have not met their burden to show that no genuine issues of fact exist as to maintenance and cure for Plaintiff's gallbladder illness and surgery.

As to Plaintiff's back injury, Defendants argue that (1) Defendant CoKa "has paid maintenance and cure benefits to Plaintiff since he elected to undergo back surgery in September of 2019"; (2) "Plaintiff has received approximately $68,795.79 in maintenance and cure benefits for his alleged injuries"; and (3) the amount Plaintiff has been paid thus far reflects the amount Plaintiff has requested, there are no delinquent payments owed, and all medical treatment and care has been paid for. *Id.* at 5. Further, Defendants argue that "Plaintiff's back injury and foot drop have reached the point of maximum medical improvement thereby terminating his entitlement to

maintenance and cure benefits." *Id.* Plaintiff argues that (1) he did not "elect" to wait until September 2019 to receive surgery; (2) he disputes that all maintenance and cure payments have been made; and (3) he has not reached maximum medical cure or improvement. Pl.'s Resp. at 8–13.

Again, material factual issues remain in dispute. For example, while Defendants assert that all medical expenses have been paid, Plaintiff asserts that some expenses are still outstanding. *See* Defs.'s 56.1 ¶¶ 12–17; Pl.'s Resp. ¶¶ 12–17. As to whether Plaintiff has reached maximum medical cure or improvement, while it is undisputed that Plaintiff is at maximum cure from a neurosurgical perspective, Plaintiff argues that his treating neurologist suggested that Plaintiff might benefit from a spine simulator. *See* Defs.'s 56.1 ¶ 21; Pl.'s Resp. 56.1 ¶ 21; Pl.'s Resp. at 11. Thus, Defendants have not met their burden to show that no genuine issues of material fact exist as to whether all maintenance and cure benefits have been paid for Plaintiff's back injury, and whether Plaintiff has reached maximum medical cure or improvement.

2. <u>Retaliatory Discharge</u>

As an initial matter, Defendants' Statement of Facts contains very few statements potentially relevant to summary judgment on the Retaliatory Discharge Claim. The undisputed portion of those statements reflect that, in April 2019, Defendant CoKa offered to sell the Vessel to Plaintiff because "it was no longer interested in owning the Vessel or having a charter business using the Vessel" and Plaintiff declined the offer. Defs.'s 56.1 ¶ 5; Pl.'s Resp. ¶ 5. Then, ten days after reporting his back injury, Defendants terminated Plaintiff's employment on July 25, 2019. Defs.'s 56.1 ¶¶ 7, 9; Pl.'s 56.1 ¶¶ 7, 9. This is not enough to show that there are no genuine issues of material fact such that Defendants are entitled, as a matter of law, to summary judgment on Plaintiff's Retaliatory Discharge Claim. While Defendants' Motion for Summary Judgment offers slightly more in its approximately one-page brief on the Retaliatory Discharge Claim, Defendants

only show that Defendant CoKa "began termination" as early as November 2018 because "[t]he business continued to not be profitable" and Defendant CoK'a manager denies Plaintiff was unlawfully terminated. ("Sobotka Dep. Tr.") (ECF No. 46-5) at 10:20–11:15.

Because "reasonable minds could differ on the inferences arising from [the] undisputed facts" here, the Court cannot grant Defendants' Motion for Summary Judgment. *See Miranda*, 975 F.2d at 1534.

### IV.   CONCLUSION

Accordingly, UPON CONSIDERATION of the Motions, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Plaintiff's Motion for Partial Summary Judgment (ECF No. 41) and Defendants' Motion for Summary Judgment (ECF No. 48) are DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this 26th day of April, 2021.

*[signature: K. M. Moore]*

K. MICHAEL MOORE
CHIEF UNITED STATES DISTRICT JUDGE

c:   All counsel of record